IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PETER HUMPHREY,
YU YINGZENG,
CHINAWHYS COMPANY LTD

               Plaintiffs,

     v.

GLAXOSMITHKLINE PLC;
GLAXOSMITHKLINE LLC

               Defendants.

**COMPLAINT**

Case No.

**COMPLAINT**

Plaintiffs Peter Humphrey, Yu Yingzeng, and ChinaWhys Company Ltd. allege the following against Defendants GlaxoSmithKline PLC and GlaxoSmithKline LLC, based upon personal knowledge when in regards to themselves and upon information and belief and the investigation of counsel as to all other matters:

**NATURE OF THE ACTION**

1.     This action arises out of a wide-ranging conspiracy by Defendants, in which they conspired to increase drug sales worldwide through, among other schemes, improper payments to doctors and other health care providers, and then further conspired to cover up their illegal activities. Defendants' conspiracy has been the subject of civil and criminal investigations by U.S. and non-U.S. government entities that have already resulted in the payment of huge fines and settlements by Defendants. Plaintiffs became victims of Defendants' scheme when a whistleblower in China sought to expose the scheme, and Defendants approached Plaintiffs to investigate the whistleblower, telling Plaintiffs that the whistleblower's allegations were false

1

and that the whistleblower was engaged in extortion. In fact, Defendants knew that the whistleblower's allegations were true, and Defendants' true motive was to use Plaintiffs to discredit the whistleblower and cover up their illegal scheme. Plaintiffs' work for Defendants, conducted based on Defendants' false statements, led to Plaintiff Humphrey and Yu's arrest, conviction and imprisonment in China, and the destruction of their business.

2.     As described in further detail herein, when a whistleblower threatened to expose Defendants' widespread scheme of bribery and corruption in China, Defendants were desperate to prevent the scheme from coming to light because they were already effectively on probation as a result of an earlier investigation by the U.S. Department of Justice that had resulted in $3 billion in fines and penalties and mandated compliance changes. They therefore approached Plaintiffs to conduct an investigation that Defendants hoped would hide the truth and obstruct further investigation. Their objective in retaining Plaintiffs was to create a dossier on the whistleblower, a former employee named Vivian Shi, to frame her as a vindictive former employee with a grudge in order to cover up their conspiracy and obstruct an ongoing investigation into it. Defendants lied to Plaintiffs, telling them that Defendants had investigated the allegations and found them to be untrue, and that the whistleblower was vindictive and engaged in a smear campaign even though Defendants knew that the whistleblower's allegations were true.

3.     In reliance on Defendants' lies, Plaintiffs embarked on an investigation of Shi focusing on her contacts and ability to effectuate a smear campaign. As Defendants did or should have expected, this put Plaintiffs on a collision course with Shi, who was innocent, and her powerful allies within the Chinese Communist Party. As the head of Defendants' China business who had orchestrated the cover-up told Humphrey after the house of cards had begun to collapse

and he was preparing to flee China himself: "Shi has read your report and she is coming after you." Plaintiffs Humphrey and Yu were, predictably, arrested, convicted in a summary proceeding, and sent to Chinese prison, where they remained in harsh conditions for almost two years, denied fresh air and proper medical treatment, and unable to see their teenage son or communicate with the outside world. While in confinement, Humphrey developed prostate cancer, for which he did not receive proper treatment, with the result that it became life-threatening. In addition, Plaintiffs lost the entire value of their profitable China due diligence business.

4.      After Plaintiffs Humphrey and Yu were arrested, Defendants' scheme was uncovered and publicly revealed. However, Defendants continued to make false statements about the investigation that they hired Plaintiffs to conduct. These false statements frustrated efforts by the British Foreign Office to secure the release of Humphrey and Yu. Thus, not only did Defendants' conduct cause the imprisonment of Humphrey and Yu, but it prolonged it.

5.      Plaintiffs, though this action, seek damages for the loss of their business, including substantial revenues from the United States, and compensation for the physical and emotional harm caused to Humphrey and Yu by their arrest and imprisonment in China and for damage to their reputation.

## PARTIES

6.      Plaintiff Peter Humphrey is a co-founder of the investigations company ChinaWhys Company Ltd. ("ChinaWhys") and a leading anti-fraud professional. Humphrey and ChinaWhys specialized in assisting U.S. and European law firms and businesses investigate and address compliance issues pertaining to anti-bribery regulations, including those set forth in the Foreign Corrupt Practices Act ("FCPA"). In particular, ChinaWhys assisted firms that were

3

being investigated by regulators in the United States, including the United States Department of Justice (the "DOJ") and the United States Securities and Exchange Commission (the "SEC"). Humphrey was highly accredited and respected in the field and oversaw the Association of Certified Fraud Examiners China Chapter, which provides anti-fraud training and raises awareness about fraud. Humphrey is a "person" as defined under 18 U.S.C. § 1961(3).

7.      Plaintiff Yu Yingzeng, an American citizen, is a co-founder of ChinaWhys and a fraud-prevention and detection expert in China. She is married to Humphrey. Yu is a "person" as defined under 18 U.S.C. § 1961(3).

8.      Plaintiff ChinaWhys Ltd., is a business founded by Peter Humphrey and Yu Yingzeng to facilitate transparency and ethical business through the provision of risk management advice and consulting services, primarily focused on the prevention and exposure of internal corruption and fraud within multinational companies, including exposure and prevention of corruption and fraud in the client's operations as well as pre-transactional due diligence to prevent future fraud.  ChinaWhys is a "person" as defined under 18 U.S.C. § 1961(3).

9.      At the time of the events relevant to this case, the majority of ChinaWhys's contracts were with companies based in the United States, including major U.S. law firms and corporations. Much of this business focused on FCPA investigations and other internal investigations. At all times relevant to this matter, ChinaWhys had numerous pending engagements and contracts with law firms and businesses in the United States. As a result of Defendants' actions, ChinaWhys lost significant revenue in the United States, and the ChinaWhys brand, goodwill and other assets were lost.

10.     Defendant GlaxoSmithKline plc. ("GSK plc") is a global pharmaceutical company with headquarters in Brentford, England; Philadelphia, Pennsylvania; and Durham, North Carolina. GSK plc is a "person" as defined under 18 U.S.C. § 1961(3). At all relevant times, GSK plc had the right to and did exercise control over the actions of its wholly-owned subsidiary GlaxoSmithKline (China) Investment Co., Ltd. (GSKCI)

11.     Defendant GlaxoSmithKline LLC ("GSK LLC"), a subsidiary of GlaxoSmithKline plc., has its principal place of business and address at 5 Crescent Drive, Philadelphia, Pennsylvania. GSK is a "person" as defined under 18 U.S.C. § 1961(3). Hereinafter, "GSK." will refer to both GSK plc and GSK LLC unless otherwise noted.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a) and (c) and 18 U.S.C. § 1964.

13.     This Court has personal jurisdiction over the parties because Plaintiffs have consented to this Court's jurisdiction, and Defendants maintain headquarters in Philadelphia, Pennsylvania.

14.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants maintain headquarters in within the district. Further, venue is proper under 18 U.S.C. § 1965.

## FACTUAL ALLEGATIONS

### GSK Pays 3 billion to Settle Claims Involving Improper Payments to Doctors.

15.     This case is set against the background of various investigations into GSK's criminal and illegal activities around the world and the intense scrutiny GSK was under by both criminal and civil regulatory authorities in the United States. In 2012, GSK entered into a

settlement agreement with the DOJ pursuant to which GSK LLC pled guilty to three misdemeanor charges under the Food, Drug and Cosmetic Act, and agreed to pay $3 billion in penalties and damages, the "[l]argest combined federal and state health care fraud recovery in a single global resolution in the history of the United States." The settlement resolved a wide range of allegations from promotion of a "false and misleading medical journal article" regarding the drug Paxil to misleadingly representing the lipid profile of drug Avandia. The settlement also resolved allegations of a pattern of illicit and corrupt relationships between GSK employees and medical doctors who prescribe GSK drugs. Specifically, with respect to one drug, Wellbutrin, "GSK paid doctors to attend lavish meetings in places such as Jamaica and Bermuda during which GSK provided off-label information to encourage doctors to write Wellbutrin prescriptions for unapproved uses of the drug."

16.     The settlement also resolved allegations that "GSK paid kickbacks to doctors to induce them to prescribe Advair, Flovent, Imitrex, Lotronex, Paxil, Wellbutrin, and Valtrex and other drugs, critically undermining the doctors' independent clinical judgment."

17.     To resolve criminal charges, GSK LLC entered guilty pleas predicated on illegal activities associated with the drugs Paxil, Wellbutrin, and Avandia, for: "distribution of a misbranded drug due to false and misleading labeling, in violation of 21 U.S.C. §§ 331(a), 333(a)(1) & 352(a)"; "distribution of a misbranded drug due to inadequate directions for use, in violation of 21 U.S.C. §§ 331(a), 333(a)(1) & 352(f)(1)"; and "failure to report data to the FDA, in violation of 21 U.S.C. §§ 331(e), 333(a)(1) & 355(k)(1)." In connection with these guilty pleas, GSK LLC agreed to pay $1 billion in criminal penalties, "the second-largest penalty for a drug company in a single criminal plea."

18.     Under the overarching agreement, GSK LLC also assented to three civil settlements, regarding: "allegations relating to false claims to federal health care programs resulting from marketing and promotion practices, including off-label marketing"; "allegations that GSK promoted Avandia to physicians and other health care providers with false and misleading representations, causing false claims to be submitted to federal health care programs"; and "allegations that GSK reported false best prices to the Department of Health and Human Services and as a result underpaid quarterly rebates owed under the Medicaid Drug Rebate Program." The civil settlement includes $2 billion in damages, "the largest civil recovery from a drug company in a single global resolution."

19.     The settlement also addressed a number of whistleblower allegations filed as *qui tam* actions under the federal False Claims Act, 31 U.S.C. § 3730.

20.     The settlement also included prospective measures including a robust set of restrictions and procedures "designed to ensure GSK's future compliance with the law," ranging from annual certification of "appropriate compliance measures" to a "five-year Corporate Integrity Agreement." That agreement "requires enhanced accountability, increased transparency and wide-ranging monitoring activities conducted by both internal and independent external reviewers."

21.     Finally, the settlement provided an exception to non-prosecution for potential actions under the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq*. While the settlement agreement contained a non-prosecution provision with the "Criminal Division of the United States Department of Justice," it contained a carve out for "any investigations of GSK that are or may be conducted in the future by the Fraud Section of the Criminal Division regarding possible violations of the Foreign Corrupt Practices Act and related offenses in connection with the sales

7

and marketing of GSK's products to foreign customers, which investigations are specifically excluded from the release."

22.    There was an important reason that this carve-out was included in the agreement. In 2010, the DOJ and the SEC had already initiated an FCPA investigation into pharmaceutical sales practices by GSK in China and other foreign nations. As set forth below, those investigations would eventually uncover widespread corruption by GSK and others with whom it was conspiring to further the sales of its drugs in China and elsewhere in the world.

**GSK Engages in Widespread Bribery in China From at Least 2010**

23.    It is now clear that, from at least 2010, GSK was participating in widespread bribery in China. For example, from between at least 2010 and June 2013, employees and agents of GSK and a China-based joint-venture engaged in various transactions and schemes to provide things of value to foreign officials, including healthcare professionals, in order to improperly influence those individuals and increase sales of GSK products in China.

24.    This misconduct was facilitated in part by the use of collusive third parties that ostensibly provided legitimate travel and other services. The funds used for the improper inducements were frequently obtained under the guise of, and falsely recorded in GSK's books and records as, legitimate travel and entertainment expenses, marketing expenses, speaker payments, payments to medical associations, and promotion expenses. Throughout this period, GSK failed to devise and maintain a sufficient system of internal accounting controls and lacked an effective anticorruption compliance program.

25.    Indeed, between 2010 and June 2013, GSK spent nearly RMB 1.4 billion (USD $225 million) on planning and travel services. However, test sampling showed that approximately 44 percent of the sampled invoices were inflated, and approximately 12 percent

were for events that did not occur. This, along with other plain evidence of bribery, was identified by the SEC in its investigation of GSK. In addition, in or around this same time period, GSK set up a special "crisis management" team in order to bribe Chinese regulators with money and gifts. Among other things, a GSK executive attempted to bribe a Chinese investigator with an iPad and a lavish dinner. This, and other bribes, were all approved by Mark Reilly who headed up GSK's Chinese operations.

**GSK Receives Anonymous Letters Alleging Widespread Corruption in China**

26.     Given the criminal and civil settlement that GSK reached with the DOJ in 2012, it was under tremendous pressure to avoid future scandals. Any additional finding of corruption would put GSK at risk of—among other things— harsher sanctions in the United States, further reputational harm, and significant harm to GSK's share price. Likewise, with U.S. regulators vowing to hold senior company officials accountable for corporate fraud, GSK's management well understood that they faced potential personal sanctions should future GSK misconduct be unearthed.

27.     In or about December 2011, a whistleblower who worked for GSK sent an email to the Chinese regulators describing widespread fraud and corruption within the company. Thereafter, approximately two dozen emails were sent over a 17-month period that provided further details of fraud and corruption.

28.     In or about April 2012, senior executives at GSK learned that a whistleblower was sending evidence of the company's criminal activity to the Chinese government. Thereafter, GSK worked to learn the identity of the whistleblower so that it could execute a plan to suppress the evidence of its illegal bribery activities. During this same time period, GSK was negotiating

with the DOJ and SEC to resolve criminal charges for improper drug marketing and kickbacks to doctors.

29.     In or about December 2012, Vivian Shi, the head of government affairs for GSK in China, was fired by the company for pretextual reasons. GSK asserted that Shi was falsifying travel expenses. However the real reason for her firing was that GSK suspected that she was a whistleblower.

30.     On January 16, 2013, approximately six months after GSK's settlement with the DOJ, an anonymous whistleblower sent an email entitled "Notification of Bribery by GSK in China" to GSK's Audit Committee, Board of Directors, Executive Management, including CEO Sir Andrew Witty, assorted media relations employees, and independent auditors at PwC.

31.     The e-mail contained detailed corruption allegations relating to GSK's business in China. This was a particularly serious problem for GSK because the DOJ was already conducting an investigation into GSK's China business for this very type of conduct. Moreover, the conduct that was reported was strikingly similar to the conduct that the DOJ had alleged had occurred in the United States resulting in GSK's $3 billion payment only six months earlier, and which GSK had said it had controls in place to prevent.

32.     Specifically, the January 16 whistleblower communication alleged that GSK China "has engaged in illegal marketing and large-scale bribery to sell its products to Chinese hospitals and doctors."

33.     The letter contained many specific allegations. First, it alleged that, as far back as 2008, "GSK deliberately falsified its books and records in order to conceal its illegal marketing practices in China, which include bribery and promoting drugs for purposes that have not been approved by the Chinese authorities."

34.     The letter included a story of a patient who nearly died after receiving the drug Lamictal for an "unauthorized, off-label use" from a hospital where GSK's salespeople prevailed on doctors to mis-prescribe the drug. It asserted that GSK quietly paid the patient RMB 50,000 through the hospital, misrepresenting the payment in its accounting "as a payment to sponsor a hospital learning seminar," so as to avoid incurring regulatory scrutiny, bad press, and the costs of additional testing.

35.     It further alleged that, despite the incident, "GSK China still required its sales employees to market and sell Lamictal to hospitals" for inappropriate off-label uses.

36.     It also detailed a "pervasive cash advance bribery scheme" pursuant to which GSK sales people "identify and target doctors who can influence purchasing decisions at their hospitals," then forge a connection "by first taking the person to expensive lunches and dinners and then giving the decision maker nice gifts," before finally "giving the doctors cash to win business."

37.     Describing bribing doctors with cash payments as "[t]he most effective, efficient, and favored 'marketing' tactic used by GSK sales personnel to win business in China," the letter explained how GSK's "strict quotas" on sales and loose cash expense controls create "a breeding ground for corruption that pits one employee against another to see who can pay the most bribes to win the biggest deals."

38.     It further described an unaudited cash advance system whereby sales representatives are given monthly allowances of RMB 10,000-25,000 for business purposes, with the only check on spending being expense reports that employees regularly fabricate and falsify.

39.     It further described a pattern in which in "higher value" cases, "the sales employee may go beyond his monthly allotment and 'kickback' a percentage of the tender to the

doctor(s) involved in making the decision," often "under the guise that it is sponsoring a seminar at the doctor's hospital."

40.     It also alleged that GSK paid for "between 500 to 1,000 doctors . . . to go on all-expense paid international vacations" each year disguised as "conference trips."

41.     Detailed in the allegations are trips of groups of 13 to 70 doctors at a time to locations such as Brazil, India, Israel, Greece, Japan, and Hungary; for which GSK would provide all tickets and expenses, in addition to "cash to cover both meals and sight-seeing excursions."

42.     The trips, meant to influence hospital decision makers and reward "large prescribers," were facilitated by a misleading GSK communication designed to make it appear as if doctors sought sponsorship to attend conferences on their own initiative rather than their being "selected and approached by GSK's sales and marketing team to attend . . . due to their abilities to influence sales decisions in the future."

43.     The letter concluded by listing internal GSK actions that allegedly "corroborate the pervasive corruption." These actions include the firing of "20 Shanghai sales employees for falsifying expenses in order to bribe doctors," instead of engaging in a broader review and audit of China sales and marketing activities; a memorandum from the head of GSK China's internal audit "acknowledging GSK China's policy of paying doctors' 'speaking fees,'" but only recommending minor changes to the practice; GSK China's frantic efforts to "[f]abricate a [p]aper [r]ecord" to show investment in "[a]nti-[b]ribery [c]ompliance"; internal communications from the management of sales for GSK China instructing employees "to destroy all non-compliant promotional materials and gifts"; the implementation of a new email program to delete emails older than a year with the goal of "reduc[ing] unnecessary legal costs"; and the

use of intermediaries such as the "Chinese Association Against Epilepsy" to funnel money to doctors in the course of bribery schemes.

44.    The whistleblower's blunt conclusion was that "[b]ribery in some form is involved in almost every sale GSK makes in China."

45.    On March 13, 2013, another anonymous email (from a different email address) was sent to GSK officials at their headquarters in the United Kingdom claiming that Mark Reilly, the general manager of GSK China, received a bribe in the form of sexual relations in return for his maximizing business for China Comfort Travel (CCT), which provides conference services to GSK.

46.    The email explains that "CCT offers invoices and fake details of conference activities to the salesmen of GSK(China), with which the salesmen of GSK get reimbursement from the company. Through this way, the salesmen pay the money to the hospitals and doctors who prescribe medicine from GSK, so as to bump the sales amount."

47.    It further stated that CCT provided an assistant, Wu Wan, to Reilly for sex in exchange for boosting GSK's business with CCT, and concludes: "[We] hope that GSK will look through this seriously and stop making unfair and illegal deals, otherwise we would submit the above mentioned details and relevant video clip to the Chinese government, and if necessary, we would also provide these materials to the US Department of Justice and the international press."

48. Attached to the email is a video file that shows Mark Reilly and a female companion engaged in sexual relations in his bedroom.

**GSK Approaches Peter Humphrey to Investigate Vivian Shi**

49.     On April 15, 2013, a former client of ChinaWhys called Peter Humphrey and told him that he wanted to introduce him to GSK, which had an urgent matter to discuss with Humphrey.

50.     At around 7:00 that evening, Peter Humphrey and Yingzeng Yu met in GSK China's Xizang Middle Road office in Shanghai with Mark Reilly, CEO of GSK (China) Investment Co., April Zhao, Legal Counsel of GSK China, and Brian Cahill, also legal counsel.

51.     At the meeting, the GSK officials, led by Cahill, said they believed that Vivian Shi, a former GSKCI government affairs director who had been terminated in December 2012, had orchestrated what the GSK officials described as a "smear campaign" against GSK. They said the "smear campaign" involved 23 emails sent to Chinese governmental entities throughout China as well as a letter to top GSK management alleging widespread corruption in GSK's Chinese pharmaceutical and vaccine businesses, with direct approval of senior management.

52.     The GSK officials told Humphrey and Yu that Shi had been terminated for expense fraud and had a "'reputation" for being "nasty." They also said that Shi had left her previous jobs under "unhappy circumstances" and had acted "vengefully" towards her former employers. These statements were intended to and did create the impression that Shi was a disgruntled, terminated employee with a motivation to make false accusations.

53.     The GSK officials knew that the allegations were *not* false. Indeed, they knew full well their truth and had been engaging in a corrupt effort to locate and bribe Chinese officials in order to prevent their illegal conduct from being exposed. It had only been a matter of months since the company paid billions of dollars in fines to the United States and it remained under the scrutiny of the DOJ and SEC. The GSK officials also knew that Shi had powerful unidentified

allies within the Communist Party elite in Shanghai and that it was therefore extremely dangerous to investigate her.

54.     The GSK officials also described to Humphrey and Yu a March 16, 2013 email sent to GSK global CEO Andrew Witty and other senior officials, including the global head of compliance and general counsel, alleging that GSK used its travel agent to channel kickbacks to customers and doctors.

55.     They also indicated that attached to the March 16 email was a video that showed Reilly having sex with a Chinese woman, who Reilly claimed was his "regular girlfriend."

56.     During the April 15 meeting, Peter Humphrey asked GSK officials for copies of the anonymous whistleblower allegations, but GSK refused to provide them.

57.     Instead, the GSK officials stressed that GSK had improved its compliance mechanisms following earlier corruption and other illegal activities that led to the settlement with the DOJ.

58.     In particular, GSK referred to the establishment of a whistleblowing system as a concrete step it had taken to show the DOJ how seriously it was taking corruption. GSK officials also stressed the development of a "compliance culture" to satisfy the DOJ and indicated that GSK had since "found more incidents of theft from the company rather than violation of compliance." This was, of course, false. GSK knew full well that the bribery scheme had occurred, and the utter failure of its compliance efforts is evidenced by the remediation and implementation of anti-corruption measures the SEC ordered GSK to take in 2016.

59.     The GSK officials told Humphrey and Yu that GSK had "launched internal investigations over the validity of [Shi's] allegations but did not find any of the allegations to be

true." This statement was false, because the GSK officials knew the accusations were true. Indeed, as would later be revealed, the illegal scheme was conducted at the direction of Reilly.

60.     The GSK officials reiterated that, in terms of the allegations, "there is nothing there," claiming that they had uncovered only minor irregularities, like a license issue in Beijing that resulted in a negligible fine. This statement was knowingly false.

61.     Humphrey and Yu offered to investigate the whistleblower allegations, but GSK declined. GSK instead asked Humphrey and Yu to "conduct a background investigation on Shi" in addition to finding whatever they could about the sex video.

62.     Plaintiffs accepted the GSK officials' representations that they had thoroughly investigated the whistleblower allegations and that there was "nothing there." On that basis, Humphrey agreed to conduct "a discreet information search on Shi, her activities, affiliations, track record with past employers, contacts and political influence, and an assessment of the potential risks that she could pose to GSK if she were hostile, and to gather any available information indicating that [she] . . . could have orchestrated a smear campaign against GSK and Mark Reilly."

63.     Humphrey and Yu's mission to obtain information on the whistleblower was predicated on the false information supplied by GSK that the whistleblower allegations were unfounded and that she was attempting to extort the company. Under this set of assumptions, Humphrey and Yu understood that undermining the whistleblower's credibility and determining the extent of her connections and influence would be essential to limiting the efficacy of her extortion.

**Humphrey and Yu Begin Their Investigation in Reliance on GSK's False Representations**

64.     Following the April 15, 2013 introductory meeting, Humphrey emailed April
Zhao, copying Reilly and Yu, to obtain the necessary information on Shi to draft an investigation
proposal. Humphrey also followed up with a phone call and reiterated his request for the
anonymous whistleblower allegations.

65.     On April 19, Silvia Feng of ChinaWhys went to GSK's Shanghai office to obtain
Shi's data. In addition to basic identification information, GSK provided a copy of an allegation
against Shi retrieved from a social networking platform about her vengeful personality and her
getting officials in Hong Kong to investigate her former boss at Johnson & Johnson. This
information was intended to cause Plaintiffs to believe that Shi was making false accusations.

66.     Three days later, Humphrey asked once again for copies of the whistleblower
allegations against GSK, which were again withheld.

67.     On May 10, 2013, GSK Audit Chair Judy Lewent and other recipients received
another email from the same anonymous email address as the January 10 whistleblower email. In
this email, the whistleblower alleged "that GSK China continues to engage in the systematic
bribery of doctors," and focused on the sales activities for GSK China's Botox business.

68.     The email discussed the "Vasily Scheme" whereby GSK pays doctors based on
their prescription numbers, using sales representatives' personal accounts as intermediaries. It
also detailed the use of private email addresses to circumvent investigations and claims to have
emails, presentations, and spreadsheets that lay bare the scheme. It further described a pay-to-
prescribe scheme that funnels money for doctors through a central source at Beijing Union
Medical College and a scheme of lecture fee payments to doctors "simply to incentivize and
reward doctors for prescribing Botox," regardless of whether the doctor delivers a lecture. It

"encourage[d] GSK to engage independent counsel who reports directly to the audit committee to investigate these serious issues and then to make a full accounting to the Chinese regulatory authorities, the U.K.'s Serious Fraud Office, and the SEC and DOJ."

69.     GSK did not inform Humphrey or Yu of this letter.

70.     On June 6, Humphrey sent an Investigation Report for "on Shi to Zhao and Cahill, copying Yu, ChinaWhys project manager Zhao Qing, and Jennifer Huang.

**Media Coverage of GSK's Alleged Bribery Begins**

71.     On June 12, 2013, less than a week later, *The Wall Street Journal* published an article about the anonymous whistleblower's allegations of bribery in China. The piece reported that GSK "is investigating allegations from an anonymous tipster that its sales staff in China was involved in widespread bribery of doctors to prescribe drugs, in some cases for unauthorized uses, between 2004 and 2010."

72.     The article summarized the whistleblower allegations as follows: "According to emails and other documents reviewed by the Wall Street Journal, the tipster has alleged that Glaxo's China sales staff provided doctors with speaking fees, cash payments, lavish dinners and all-expense-paid trips in return for prescribing the drug firm's products."

73.     The article further described allegations "that between 2004 and 2010, Glaxo regularly gave cash to its sales staff in China, and that some of it went directly to doctors at Chinese hospitals in return for agreeing to prescribe drugs to patients. Some sales staff then submitted fraudulent expenses to account for the funds."

74.     The article included a reference to the allegations described above about the near death of a patient due to off-label Lamictal use.

75.     The article also referenced GSK's efforts "to repair its image after recent multibillion-dollar settlements with U.S. regulators tied to drug-marketing tactics," in which GSK "admitted marketing practices relating to some of its drugs were illegal."

76.     The article noted that GSK "is also being investigated by U.S. authorities over whether it paid bribes to foreign government officials," noting that CEO Andrew Witty "has said making the company more transparent is a priority." Specifically with regard to the FCPA investigation, the article notes that GSK disclosed in a regulatory filing the previous year that the DOJ and SEC investigations were ongoing.

77.     GSK confirmed to the *Journal* reporters the firing of 20 Shanghai sales employees alleged to be involved in bribery activities but maintained that they were fired because of "inappropriate expense claims and there was no evidence the funds were used to bribe health-care professionals."

78.     The article included the following statement from a GSK spokesperson: "Over the last four months we have used significant resources to thoroughly investigate each and every claim from this single, anonymous source and have found no evidence of corruption or bribery in our China business."

## GSK Asks Humphrey and ChinaWhys Overtly To Obstruct the Chinese Government Investigation, Humphrey Refuses, and Reilly Flees China

79.     On June 17, 2013, following the *Wall Street Journal* article and follow-on media attention, and after Humphrey had provided GSK with his report on Shi, GSK senior legal counsel Jennifer Huang emailed Humphrey asking ChinaWhys to identify the "source" of the whistleblower email and the Mark Reilly sex tape email and "any background information of the

email address of the Whistle blower" as well as "back-end information" for certain "mini-blog account[s]."

80.    On June 26, 2013, June Soon, Executive Secretary of Asia Pacific for GSK at GSK Pte Ltd. sent two whistleblower emails as attachments to her message to Humphrey and ChinaWhys manager Zhao Qing. Humphrey was in the United States at the time.

81.    On June 27 and 28, the police raided multiple GSK China offices,

82.    Following those raids, while Humphrey was still in the United States, GSK senior legal counsel Jennifer Huang asked ChinaWhys to investigate the Public Security Bureau (PSB) and to "prepare an Organic analysis ASAP on the Chinese political regime, particularly on Chinese Communist Party Regime, PSB, and state council with official's name identified."

83.    Humphrey and Huang had a phone call that same day, while Humphrey was still in the United States. Huang said she wanted to investigate the PSB "to find out who's who in the investigation." Humphrey became concerned that GSK was seeking to obstruct the investigation by Chinese authorities and replied that he could not do anything that could be deemed as violating state secrets and thus could only use public information for his research.

84.    On July 1, GSK China's head of business development, Leslie Chang, asked Humphrey to investigate various government organs. Chang asked Humphrey to look into the Ministry of Public Security, the Economic Crimes Investigation Department and its relationship "to the ministry and local provincial PSB," and the "relationship between the Ministry of PSB and the Political Bureau of the Central Committee." Further, Chang instructed Humphrey to "provides [sic] names and titles of key officials."

85.    Humphrey refused.

86.     On July 1, 2013, Mark Reilly's personal assistant Maggie Zheng contacted Humphrey, who had just arrived back in China from the United States, to arrange a meeting with Reilly the following day.

87.     Humphrey and his colleague Zhao Qing met Reilly in a meeting room in the Marriott Hotel at Tomorrow Square on Nanjing Road in Shanghai that Reilly had booked because the PSB were in his office. Reilly told Humphrey that Vivian Shi had "read your report and she will be coming after you."

88.     Reilly sought advice, and Humphrey stated ChinaWhys could "no longer provide service," instead telling Reilly to retain a crisis management service.

89.     Reilly told Humphrey he was planning to leave China the following day for London.

90.     The following day, Mark Reilly fled China.

**Humphrey and Yu Are Arrested**

91.     As Reilly predicted, the retaliation for the attack he had orchestrated on Vivian Shi in an attempt to cover up his and GSK's own crimes came swiftly, but it fell, predictably, on Humphrey and Yu, since Reilly was by then safely back in Britain. On July 10, 2013, Shanghai police raided ChinaWhys' office in that city as well as the Humphrey's Beijing home. These raids provided a chilling indication of what Yu and Humphrey were about to endure at the hands of the Chinese authorities. The police placed Humphrey (age 57) and Yu (age 60) in handcuffs and took them to the police headquarters to be interrogated until past midnight. A police officer told Humphrey: "This was ordered from above. This is related to GSK."

92.     Humphrey and Yu were separately transported to Shanghai Detention House and placed in crowded cells. Humphrey's cell contained 12 inmates in a space of roughly 15 square

meters; Yu's cell contained 10 inmates. There was no furniture in the cells, no hot water for washing, no clean bedding, and no private toilet. Humphrey and Yu were not allowed to write letters or make phone calls; even to their families and lawyers. Both were forced to sit on the floor for hours continuously, causing extreme pain, and they were deprived of fresh air and sunlight for months at a time.

93.     On August 16, 2013, Humphrey and Yu were formally arrested.

### Humphrey and Yu Are Tried and Convicted in a "Show Trial" and Sent to Prison

94.     The prosecution that followed was abusive and lacking in any due process. Humphrey and Yu's attorneys requested bail twice for health and family reasons, but Shanghai police denied the requests, claiming "this was the first time Shanghai had arrested foreign investigators, and therefore the case would be used to make an example of the kind, regardless whether guilty or innocent."

95.     Prior to their trial, Humphrey and Yu were repeatedly deceived by police and prosecutors who found excuses to delay any judicial process as a means to keep them detained. They misled Humphrey and Yu into appearing in a fake "media interview," and paraded them on television dressed in orange vests, handcuffed, and locked in a metal cage. They told them to make an apology in exchange for leniency, and then broadcast nationwide what they called a "confession of crime." The prosecutors systematically blocked the rights of the defense attorneys to view the case files.

96.     The show "trial" took place on August 18, 2014. The trial generally proceeded without anything resembling due process. For example, the prosecutors fabricated witness statements for "witnesses" who never testified in court. But none of that was necessary, since the judge had long before made up his mind about the outcome of the case.

97.    Humphrey and Yu were led to understand that their prosecution was procured at the behest of Shi, seeking revenge against them for the investigation that they conducted based upon the false statements of GSK. On August 8, 2014, after already having been detained for 13 months without a trial, Humphrey was sentenced to 2.5 years in prison; Yu was sentenced to 2 years.

98.    Humphrey was transferred to Qingpu Prison and Yu to Shanghai Women's Prison to serve out their terms. While in prison, Humphrey and Yu suffered from a wide range of maltreatment ranging from passive denial and ignorance of requests for basic needs, to active and aggressive cruelty at the hands of prison guards.

99.    In September 2013, while still at the detention center awaiting trial, Humphrey had noticed his prostate was swollen and urination was irregular, and thus requested medical treatment from resident doctors at the Detention House. Humphrey underwent an ultrasound that showed his prostate had enlarged and calcified. Despite the guidance of civilian doctors that extensive additional tests were necessary, officers prevented Humphrey from undergoing any further tests. Humphrey only underwent some of the necessary tests some 21 months after his detention following the intensified entreaties of the British consulate; a delay that allowed his cancer to develop untreated. Following two years in prison without adequate access to care, Humphrey was diagnosed with life-threatening prostate cancer that a specialist physician indicated could have been prevented had Humphrey received appropriate medical attention at the beginning of his time in prison.

100.    Humphrey also experienced growing neck pain that had begun when officers kicked a door into his face during their raid of ChinaWhys' office. Prison officials denied Humphrey's family's request to give him a neck brace to alleviate his suffering.

101.    Prison officers told inmates that Humphrey was a British spy and ordered them not to associate with or talk to him, effectively isolating Humphrey from the moment of his arrival.

102.    While in Qingpu Prison, Humphrey suffered various other cruel and embarrassing treatment, including: officers scattering his belongings during cell searches; pressuring him to sign a confession to gain privileges or avoid solitary confinement or an extended sentence; parading him around in his prison uniform, handcuffed and leg-manacled in front of the general public on the rare occasion towards the end of his captivity when he was taken to visit a hospital for medical treatment; and preventing him from telephoning family members and his consuls after he learned that he a prostate tumor. He also was given a diet lacking basic nutrients such as proteins, vitamins and minerals, and after his release found his calcium and vitamin D levels dangerously low.

103.    Yu's treatment, though not as vindictive and capricious as Humphrey's, was similarly harsh, causing her severe distress. During her 23 month incarceration, including at Shanghai Women's Prison, Yu was deprived of fresh air and sunlight and not allowed to spend any time outside or exercising. She was not permitted to telephone her family at all, unlike other prisoners, and her correspondence was severely curtailed and censored. She also was given a diet lacking basic nutrients such as proteins, vitamins and minerals, and after her release found her calcium and vitamin D levels dangerously low. A London doctor found these levels to be at only a quarter of the required level. She was also suffering from blood in her urine and a damaged kidney.

104.    Word of Humphrey and Yu's ill treatment eventually reached Western media, including *The Telegraph*, which noted that while in the pre-trial detention center for 14 months

24

the couple could not see each other save for "occasionally snatch[ing] glimpses of each other through windows or doors" on their way to interrogations. The same article noted that Humphrey and Yu's son was not permitted to visit his parents in jail.

105.    On June 9, 2015, Humphrey and Yu were released from prison.

106.    After a brief period of house arrest, and a battery of threats, Humphrey and Yu were finally permitted to leave and were deported from China on June 17, 2015.

107.    Throughout their incarceration, Humphrey's teenage son was denied access to the family's assets and had to live on the charity of friends.

**GSK Lies About its Knowledge of Corruption and Refuses to Admit Why it Hired Plaintiffs.**

108.    Following the arrest of four senior GSK China executives in July of 2013, GSK's global CEO, Sir Andrew Witty, stated "[i]t appears that certain senior executives in the Chinese business have acted outside of our processes and our controls to both defraud the company and the Chinese healthcare system." Witty claimed, however, that GSK's head office in London lacked knowledge of the whistleblower's allegations and "had no sense of this issue."

109.    This made no sense, since the previous month, GSK effectively admitted that it did "have a sense" of the issue, since it announced that its "four-month internal investigation into allegations of bribery and corruption in China found 'no evidence of corruption or bribery in our Chinese business.'"

110.    Witty argued, nonsensically, that the previous whistleblower allegations were "quite different" from the more recent charges, saying "[t]hey are two completely different sets of issues: we fully investigated the first and of course this has now surfaced in the last couple of weeks."

111.     This was a lie, since what "surfaced" in the PSB investigation and raids of GSK offices in July was precisely the illegal activity that the whistleblower had documented and threatened to reveal in January.

112.     Approximately a year later, while Humphrey and Yu were detained and still awaiting trial, GSK issued a "Statement in Response to Recent Media Coverage Related to Our China Business". The statement claimed that GSK had investigated "allegations made in early 2013 about GSK's business in China . . . over several months with the support of external legal and audit advice" and that, with the exception to minor expense claims fraud, "this investigation did not find evidence to substantiate the specific allegations made in the whistleblower emails."

113.     GSK further stated that its China business "hired ChinaWhys in April 2013 to conduct an investigation following a serious breach of privacy and security," the Reilly sex tape, but that ChinaWhys was "not hired to investigate the substance of the allegations of misconduct made by the whistleblower." This statement was misleading at best since the "breach of privacy and security" was actually a whistleblower reporting directly on the corruption allegations.

114.     This misleading statement by GSK prolonged Humphrey and Yu's incarceration, because British diplomats attempting to intervene of Humphrey and Yu's behalf did not have accurate information about what had led to their arrest.

115.     For example, an article published in *The Telegraph* on July 6, 2014 quotes a British official involved in efforts to intervene on behalf of Yu and Humphrey: "GSK refused to reveal the reasons why they had originally employed [Humphrey's] services and that this impeded British attempts to intervene on his behalf." "GSK were really cagey. They just kept saying it was routine work and kept the information deliberately vague. When we went to the Chinese we were arguing with one hand tied behind our backs."

**GSK Admits Corruption in China**

116.   On September 19, 2014, GSK issued a Statement of Apology to the People of China in which it announced that "GSK China Investment Co. Ltd (GSKCI) has been identified according to Chinese law to have offered money or property to non-government personnel in order to obtain improper commercial gains, and has been found guilty of bribing non-government personnel." On September 19, 2014, GSK was fined $492 million for its bribery activities in China "in the biggest such penalty ever imposed by a Chinese court."

117.   Mark Reilly, the CEO of GSK China, was convicted for his part in the bribery scheme and sentenced to three years prison with a four-year reprieve and ordered deported, meaning he will never serve his sentence.

118.   Four Chinese nationals were also given prison sentences along with reprieves.

119.   GSK's statement includes an apology "for the harm caused to individuals who were illegally investigated by GSKCI." This apology appears to be directed at Vivian Shi, the former employee GSK had directed ChinaWhys to investigate, and contradicts GSK's other statements about ChinaWhys.

120.   On September 30, 2016, GSK plc entered into a settlement agreement with the SEC relating to its bribery scheme in China. The company agreed to pay $20 million—this in addition to what it paid to the Chinese authorities. In connection with that settlement, the company must also make regular reports to show that it is overhauling it lax internal controls and is instituting basic safeguards to prevent corruption going forward. The SEC Order and associated documents and findings of fact are incorporated herein by reference.

## CAUSES OF ACTION

### First Cause of Action

**Violations of 18 U.S.C. § 1962(c) (Racketeering)**

121.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

122.    Each of the individuals and corporate entities is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise, the GSK Drug Bribery and Promotion Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

123.    The GSK Drug Bribery and Promotion Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 9161(4), consisting of Defendant corporations, including their employees, agents and external consultants, specifically former employees Mark Reilly, Gary Zhang, Liang Hong, April Zhao Hongyan, and others convicted of crimes related to GSK activities; unnamed doctors in the United States, China, and other countries who accepted bribes and kickbacks from GSK; Sino-American Tianjin Smith Kline & French Laboratories Ltd; various unnamed travel agents, conference organizers, and other third-party service providers; various Chinese health care providers; the Chinese Association Against Epilepsy; and other as yet unknown individuals and entities. All entities are persons within the meaning of 18 U.S.C. § 1961(3) and acted to enable Defendants to bribe medical doctors and other health care providers to prescribe GSK products to patients, even in cases when such prescription was medically inappropriate or dangerous; to deceive the DOJ and other regulators regarding corporate practices, compliance protocols and the integrity of their internal controls; and to mislead Humphrey, Yu, and ChinaWhys into performing a fraudulent investigation designed to cover up illegal and pernicious activities in China and thwart investigations into those activities. The GSK Drug Bribery and Promotion Enterprise functioned as an ongoing organization and continuing

unit. The GSK Drug Bribery and Promotion Enterprise was created and/or used as a tool to

effectuate a pattern of racketeering activity. Defendants, in concert with other participants in the

GSK Drug Bribery and Promotion Enterprise, created and maintained systematic links for a

common purpose—to maximize and protect GSK profits through the creation and management

of a massive scheme of bribery and fraud, whereby GSK sales representatives gave goods,

services, and cash to doctors in exchange for aggressively prescribing drugs and vaccines, often

for unapproved and inappropriate uses, and thus boosting corporate revenue. Each of the

participants in the GSK Drug Bribery and Promotion Enterprise received substantial revenue

from the scheme to bribe doctors. Such revenue was significantly greater than it would have been

if GSK had abided by the laws of China, the United States, and other jurisdictions and refrained

from illegally providing doctors with payments for their prescribing GSK products, or if GSK

had legitimately investigated and lawfully addressed the whistleblower claims in China;

including reporting to and cooperating with Chinese and American regulators and law

enforcement agencies. All participants in the GSK Drug Bribery and Promotion Enterprise were

aware of Defendants' control over the activities of the GSK Drug Bribery and Promotion

Enterprise in bribing doctors and misrepresenting, including by omission, GSK's activities to

government bodies including the DOJ, with whom GSK had previously signed a Settlement

Agreement. Furthermore, each portion of the enterprise benefited from the existence of the other

parts.

124.    The GSK Drug Bribery and Promotion Enterprise engaged in and affected

interstate commerce because, *inter alia*, it sold drugs and vaccines throughout the United States

and maintains relationships with various doctors and medical entities throughout the United

States, and foreign commerce because it sold vaccines, drugs, and other goods and services on a

global scale, including those sales made by virtue of fraud and bribery schemes, including in the United States, China, and numerous other countries.

125.   Defendants exerted control over the GSK Drug Bribery and Promotion Enterprise and management of the affairs of the GSK Drug Bribery and Promotion Enterprise.

126.   Pursuant to and in furtherance of their fraudulent scheme, Defendants conducted and participated in the affairs of the GSK Drug Bribery and Promotion Enterprise through patterns of racketeering activity, including multiple acts indictable under 18 U.S.C. §§ 1341 (mail fraud); 1343 (wire fraud); 1510 (Obstruction of a criminal investigation); 1512 (tampering with witnesses); 1513 (Retaliating against a witness, victim, or an informant); 1952 (use of interstate facilities to conduct unlawful activity), and 1956 (money laundering).

127.   Defendants' fraudulent scheme consisted of, *inter alia*: deliberately misrepresenting facts to Humphrey, Yu, and ChinaWhys to induce them to carry out an investigation that served GSK's political goals and provided cover for GSK's illegal activities; engaging in massive fraud and bribery schemes as detailed through the successful prosecution and conviction of GSK's China CEO and four other senior officials and the findings made by the SEC; the firing of and retaliation against whistleblowers; the bribing of various Chinese officials who would share information relating to the bribery scheme with U.S. criminal and regulatory authorities; the laundering of money through various schemes, including through false travel expenses; an array of other activities, including some which rise to the level of felonious wire fraud, including but not limited to failure to report data to the FDA, distribution of a misbranded drugs due to inadequate directions for use, distribution of a misbranded drug due to false and misleading labeling, providing doctors with kickbacks, fraudulently misleading sales staff and medical professionals through the promotion of false information and suppression of unfavorable

information, and other illicit activities as detailed in GSK's 2012 DOJ Settlement Agreement; improperly and illegally withholding or distorting knowledge of such schemes from the DOJ and other law enforcement and regulatory bodies; and violating compliance measures agreed upon with the DOJ by ignoring reporting requirements as pertaining to corporate integrity.

128.    Defendants' use of the mail and wires to perpetuate its fraud involved thousands of communications, including, but not limited to:

    a.  Communications with and among the enterprise participants instructing, permitting, encouraging, and carrying out fraud and bribery through cash payments and kickbacks to medical doctors in China, the United States, and other countries, as admitted by Mark Reilly and four Chinese officials in guilty pleas in Chinese court, including Gary Zhang and Liang Hong;

    b.  Communications with travel agents and other third-party service providers to facilitate sham seminars, conferences, and other events with the purpose of providing travel and other gifts as inducements to and compensation for doctors prescribing GSK products;

    c.  Communications with Humphrey, Yu, and other ChinaWhys employees, including those undertaken with Humphrey while he was in the United States (19-29 June 2013), fraudulently inducing them to carry out a contrived investigation to serve GSK's political goals and as a means of setting up Humphrey, Yu, and ChinaWhys to shield GSK from consequences of its illegal actions in China, substituting Humphrey, Yu, and ChinaWhys as a target and scapegoat;

    d.  Receiving the proceeds in the course of and resulting from Defendants' improper scheme in the form of profits from GSK product sales;

e. Failure, in communication with the DOJ and other regulators and law enforcement agencies, to abide by the terms of GSK's 2012 Settlement Agreement and attendant Administrative Resolution, including a five-year Corporate Integrity Agreement with the Office of the Inspector General of the Department of Health and Human Services;

f. Transmittal and receipt of monies from insurance companies, medical organizations, patients, and health care providers;

g. Transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the GSK Drug Bribery and Promotion Enterprise.

129.   At all times during the fraudulent scheme, Defendants' and the Fraud Participants had a legal and ethical obligation of candor to and honest dealing with public and private payors, physicians and the medical community, Humphrey, Yu, ChinaWhys, Chinese regulators and law enforcement bodies, and United States government bodies such as the DOJ and the SEC.

130.   The conduct of the GSK enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decisions and activity in connection with the GSK enterprise to routinely conduct its transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

131.   The above described racketeering activities amounted to a common course of conduct intended to deceive and harm Plaintiffs. Each such racketeering activity was related, had similar purposes, involved similar or the same participants, and methods of commission, and had similar results affecting the same or similar victims, including Plaintiffs. Defendants' racketeering activities were part of their ongoing business and constitute a continuing threat to the property of Plaintiffs.

132.     Plaintiffs have been injured in their property by reason of these violations in that, among other things, Plaintiffs' business was destroyed and their prospective business ventures eviscerated by Defendants' pattern of racketeering activity.

133.     The injuries to Plaintiffs were directly and proximately caused by Defendants' racketeering activity.

134.     Plaintiffs, both directly and indirectly, relied on the representations as to the falseness of the whistleblower's claims as made by the Defendants. Because Defendants controlled all knowledge regarding the whistleblower allegations, including the anonymous charges themselves, which Plaintiffs were not permitted to read for weeks despite repeated requests, Plaintiffs were obligated to rely on Defendants' representations about the whistleblower's identity and the veracity of her claims. Further, Defendants perpetuated this reliance by taking the steps itemized above to target Plaintiffs' investigation at Vivian Shi and suppress the dissemination of information that would have allowed them to better understand the validity of the whistleblower allegations and from whom they may have originated.

135.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

136.     By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered damages. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

137.     By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in a sum that exceeds the jurisdiction of all lower courts.

**Second Cause of Action**

**Violation of 18 U.S.C. § 1962(d) (Conspiracy)**

138.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

139.     Section 1962(d) of RICO provides that "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

140.     Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962 (c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the GSK enterprise described previously through a pattern of racketeering activity. The corporate defendants conspired with, inter alia, Mark Reilly and others to promote the red herring investigation of Vivian Shi as a whistleblower making false claims and suppress evidence of GSK's fraud and bribery in China.

141.     Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs of money.

142.     The nature of the above-described acts of Defendants' co-conspirator's acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity demonstrated through related and continuous acts.

143.     As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c),

34

Plaintiffs have been and are continuing to be injured in their business or property as set forth more fully above.

144.   Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

   a.   Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

   b.   Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

   c.   Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346;

   d.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952;

   e.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1510 (Obstruction of a criminal investigation);

   f.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1512 (tampering with witnesses);

   g.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1513 (Retaliating against a witness, victim, or an informant); and

   h.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1956 (money laundering).

145.   Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs Humphrey and Yu have been jailed and put out of business, which they would not have suffered had Defendants not conspired to violate 18 U.S.C. § 1962(c).

146.    Injuries suffered by Plaintiffs were directly and proximately caused by Defendants' racketeering activity as described above.

147.    Plaintiffs directly relied on the racketeering activities of the Defendants and the GSK enterprise. Plaintiffs, both directly and indirectly, relied on the representations as to the identity of the whistleblower and the falsity of her claims. Because Defendants controlled all knowledge of such allegations and their veracity, Plaintiffs were obligated to rely on Defendants' misrepresentations regarding the whistleblower and predicate schemes of fraud and bribery. Defendants perpetuated this reliance by taking the steps itemized above to target Plaintiffs' investigation at Vivian Shi and suppress the dissemination of information that would have allowed them to better understand the validity of whistleblower allegations and from whom they may have originated.

148.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorney's fees.

149.    By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered damages. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### Third Cause of Action

### State Claim: Fraud

150.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

151.    Defendants asked Plaintiffs to investigate Vivian Shi, a highly connected Chinese national who had been head of Government Affairs for Defendants in China. Defendants represented to Plaintiffs that they believed that Shi had sent anonymous letters making false accusations, and that they wanted to assess the potential damage that Shi could inflict on the company by spreading untrue rumors. Defendants also represented to Plaintiffs that they had investigated the allegations contained in the anonymous letters and determined that they were untrue.

152.    These statements were knowingly false when made, as Defendants knew that the accusations in the anonymous letters were not false. In fact, the individual Defendant officers who made the statements had orchestrated the illegal conduct that was the subject of the allegations. However, Defendants wanted to frame Shi as an extortionist in order to prevent the truth of the allegations from coming to light.

153.    Defendants made these false statements with the intent to induce Plaintiffs to rely on them and to create a dossier on Shi to bolster the false assertion that she was an extortionist making false claims and hide the truth about the allegations. They knew that Plaintiffs would not agree to conduct an investigation for illegal purposes, so Defendants hid their true motives and actively concealed facts known to them.

154.    Defendants' misrepresentations were material, and caused Plaintiffs to agree to conduct the initial investigation.

155.    Plaintiffs justifiably and directly relied on Defendants' affirmations, including because Defendants continually denied Plaintiffs permission to read the original emails until after they had investigated and prepared a report on Shi.

37

156.    Defendants' misrepresentations were the proximate cause of Plaintiffs' arrest. Plaintiffs were arrested and imprisoned for investigating Vivian Shi, which they would not have done had Defendants not hired them and misrepresented the purpose and nature of the investigation.

## Fourth Cause of Action

### State Claim: Intentional Infliction of Emotional Distress

157.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

158.    Defendants intentionally misled Plaintiffs and induced them into investigating an innocent person under the guise that she was making false allegations in an attempt at extortion.

159.    Defendants intentionally placed Plaintiffs at risk by causing them to investigate someone connected to the Chinese government in order to aid Defendants' attempt to suppress investigations of their wrongdoing.

160.    Defendants intentionally continued to lie about Plaintiffs' involvement in the case, including after they were arrested, making it appear as if they had been conducting a rogue investigation.

161.    Defendants' conduct was extreme and outrageous, and went beyond all bounds of decency, because it put Plaintiffs in danger and caused them to be arrested and imprisoned by Chinese authorities. Defendants' continued false public statements about Plaintiffs were extreme and outrageous because they obstructed the British and American authorities from being able to fully assist Plaintiffs.

162.    Defendants' conduct was a direct cause of Plaintiffs' severe emotional distress.

163.    Defendants' conduct was a proximate cause of Plaintiffs' severe emotional distress, as Defendants' misrepresentations to Plaintiffs caused them to investigate an innocent person with powerful allies in the Chinese government. Defendants' misrepresentations caused Plaintiffs to be arrested and imprisoned by Chinese authorities for twenty three months under conditions of neglect and abuse that caused them severe emotional distress.

## Fifth Cause of Action

### State Claim: Negligent Infliction of Emotional Distress

164.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

165.    Defendants intentionally or negligently misled Plaintiffs and induced them into investigating an innocent person under the guise that she was making false allegations in an attempt at extortion.

166.    Defendants intentionally or negligently placed Plaintiffs at risk by causing them to investigate someone connected to the Chinese government in order to aid Defendants' attempt to suppress investigations of their wrongdoing.

167.    Defendants intentionally or negligently continued to lie about Plaintiffs' involvement in the case, including after they were arrested, making it appear as if they had been conducting a rogue investigation.

168.    Defendants' conduct was at a minimum negligent.

169.    Defendants' conduct was a direct cause of Plaintiffs' severe emotional distress.

170.    Defendants' conduct was a proximate cause of Plaintiffs' severe emotional distress, as Defendants' misrepresentations to Plaintiffs caused them to investigate an innocent person with powerful allies in the Chinese government. Defendants' misrepresentations caused

Plaintiffs to be arrested and imprisoned by Chinese authorities for twenty three months under conditions of neglect and abuse that caused them severe emotional distress.

### Fifth Cause of Action

### State Claim: Civil Conspiracy

171.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

172.    Defendants have conspired to deliberately misrepresent facts to Plaintiffs to induce them to carry out a misguided investigation that served Defendants' political goals, and provided cover for their illegal activities.

173.    Defendants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of their conspiracy, including:

    a.   Engaging in massive fraud and bribery schemes as detailed through the successful prosecution and conviction of GSK's China CEO and four other senior officials;

    b.   Failure to report data to the FDA;

    c.   Distribution of misbranded drugs due to inadequate directions for use;

    d.   Distribution of a misbranded drug due to false and misleading labeling'

    e.   Providing Doctors with kickbacks;

    f.   Fraudulently misleading sales staff and medical professionals through the promotion of false information and suppression of unfavorable information;

    g.   Other illicit activities as detailed in GSK's 2012 DOJ Settlement Agreement;

    h.   Improperly and illegally withholding or distorting knowledge of such schemes from the DOJ and other law enforcement and regulatory bodies;

      i.    Intimidating witnesses through an overreaching internal investigation in China facilitated by an outside law firm; and,

      j.    Violating compliance measures agreed upon with the DOJ by ignoring reporting requirements as pertaining to corporate integrity.

174.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs Humphrey and Yu would not have been indicted, convicted, and jailed in China, nor would they have had their business shuttered, their health deteriorate without treatment, or their prospective business ventures eviscerated had Defendants not engaged in this civil conspiracy.

175.    By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in a sum that exceeds the jurisdiction of all lower courts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    On Plaintiffs' RICO claims: compensatory damages, and enhancement of damages Plaintiffs have sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs' costs in this suit, including reasonable attorneys' fees;

2.    On Plaintiffs' fraud, intentional infliction of emotional distress, negligent infliction of emotional distress and civil conspiracy claims: compensatory and punitive damages in an amount to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

Dated:      Philadelphia, Pennsylvania
               November 15, 2016

                             Respectfully Submitted,

                             GALLAGHER & TURCHI

                             Joan D. Gallagher
                             1600 Market Street
                             Suite 1320
                             Philadelphia, Pennsylvania 19103
                             215-963-1555
                             joanie@gallagher-law.com

                             Philip M. Bowman
                             John T. Zach
                             Boies, Schiller & Flexner LLP
                             575 Lexington Avenue
                             New York, New York, 10022
                             (212) 446-2300
                             pbowman@bsfllp.com
                             jzach@bsfllp.com
                             *To be admitted Pro Hac Vice (Applications Pending)*