IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PETER HUMPHREY**, *et al.* | : | CIVIL ACTION |
| *Plaintiffs* | : | |
| | : | NO. 16-5924 |
| v. | : | |
| | : | |
| **GLAXOSMITHKLINE, PLC.**, *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    SEPTEMBER 29, 2017

# MEMORANDUM OPINION

**INTRODUCTION**

Before this Court is a *motion to dismiss* filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), (2), (6), and (7) by Defendants GlaxoSmithKline plc ("GSK PLC") and GlaxoSmithKline LLC ("GSK LLC") (collectively "Defendants"), which seeks the dismissal of federal claims for racketeering and conspiracy related racketeering under 18 U.S.C. § 1962(c) and § 1962(d), respectively, and state law claims for fraud, intentional infliction of emotional distress, negligent infliction of emotional distress, and civil conspiracy, asserted against them by Plaintiffs Peter Humphrey ("Humphrey"), Yu Yingzeng ("Yingzeng"),[1] and ChinaWhys Company Ltd. ("ChinaWhys") (collectively "Plaintiffs") in the complaint. [ECF 19]. Plaintiffs oppose the motion. [ECF 23]. The issues raised in the motion to dismiss have been fully briefed by the parties,[2] and are now ripe for disposition. For the reasons stated herein, Defendants' motion to dismiss is granted.

---

[1] The caption of the complaint and the section describing the parties identifies this Plaintiff as "Yu Yingzeng." (Compl. at p. 1, ¶ 7). However, later in the complaint, she is identified as "Yingzeng Yu." (*Id.* ¶ 50). For clarity, this Court will refer to this party as "Yingzeng."

[2] In considering the motion to dismiss, this Court has also considered Defendants' reply, [ECF 25], and their notice of supplemental authority. [ECF 26].

**BACKGROUND**

Plaintiffs initiated this action on November 15, 2016. [ECF 1]. In their motion, Defendants argue that the complaint should be dismissed because: (1) pursuant to the consulting agreement that forms the basis of all of Plaintiffs' claims, all claims against Defendants are subject to arbitration; (2) this Court lacks personal jurisdiction over GSK PLC; (3) the complaint fails to state claims upon which relief may be granted; (4) Plaintiffs have failed to join an indispensable party; (5) Plaintiffs lack standing to assert claims brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; and (6) this Court lacks diversity jurisdiction over Plaintiffs' state law claims. Plaintiffs challenge these contentions.

When ruling on Defendants' motion to dismiss, this Court must accept, as true, all relevant and pertinent factual allegations in the complaint and construe these facts in the light most favorable to Plaintiffs. *See Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)); *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (standard applies to Rule 12(b)(1) motions). Here, the factual allegations in the complaint are summarized as follows:

> Plaintiffs Humphrey and Yingzeng are co-founders of ChinaWhys, a company that assists businesses in the United States and Europe in addressing compliance issues pertaining to anti-bribery regulations. (Compl. ¶¶ 6-8). Humphrey and Yingzeng are married to each other. (*Id.* ¶ 7). Yingzeng is a United States citizen. (*Id.*). At the relevant time of the events in the complaint, they shared a home in Beijing, China. (*Id.* ¶ 91); [*see* ECF 23 at 13]. Much of ChinaWhys' business involved companies based in the United States. (Compl. ¶ 9).
>
> GSK PLC is a global pharmaceutical company headquartered in Brentford, England; Philadelphia, Pennsylvania; and Durham, North Carolina; and at all relevant times, exercised control over its subsidiary, GlaxoSmithKline (China) Investment Co., Ltd. ("GSK China"). (*Id.* ¶ 10). GSK LLC is a

subsidiary of GSK PLC, and its principal place of business is Philadelphia, Pennsylvania. (*Id.* ¶ 11).[3] GSK China is not a party defendant.

Plaintiffs allege that since at least 2010, Defendants, with the approval of Mr. Mark Reilly ("Reilly"), the CEO of GSK China, engaged in widespread bribery in China in order to increase Defendants' sales in China. (*Id.* ¶¶ 25, 50). In December 2011, a whistleblower, who worked for Defendants, began emailing information about Defendants' widespread fraud and corruption to Chinese regulators, ultimately sending approximately two dozen emails over a 17-month period. (*Id.* ¶ 27). In April 2012, Defendants learned of the whistleblower and worked to uncover his or her identity. (*Id.* ¶ 28).

In December 2012, Defendants terminated Vivian Shi ("Shi"), the head of government affairs for GSK China for allegedly falsifying travel expenses. (*Id.* ¶ 29). Plaintiffs contend that Shi was actually fired because Defendants suspected that she was the whistleblower. (*Id.*). Subsequent to Shi's firing, several emails were sent anonymously to Defendants detailing the corruption and bribery that was taking place; specifically that the head of GSK China's internal audit had uncovered GSK China's policy of paying doctors, fabricating a paper record to show anti-bribery compliance, and instructing its employees to destroy non-compliant promotional materials and gifts. (*Id.* ¶¶ 30-44).

On April 15, 2013, Humphrey and Yingzeng, at the behest of a former client, met with CEO Reilly, April Zhao ("Zhao"), legal counsel for GSK China, and Brian Cahill ("Cahill"), another attorney, at GSK China's Shanghai office. (*Id.* ¶¶ 49-50). At that meeting, Humphrey and Yingzeng were told that Shi had been terminated for expense fraud and that she was suspected of orchestrating a smear campaign against the company by sending false emails to Chinese government officials regarding alleged corruption and bribery. (*Id.* ¶ 51). Humphrey and Yingzeng were led to believe that Shi was a disgruntled former employee who had a motivation to make false accusations. (*Id.* ¶ 52). Plaintiffs allege, however, that "GSK officials" knew that the allegations of corruption and bribery were not false, and that the illegal scheme had been conducted at Reilly's direction.[4] (*Id.* ¶¶ 53, 59). Plaintiffs also allege that the "GSK officials" knew that Shi had "powerful unidentified allies within the Communist party elite" and that it was extremely dangerous to investigate her. (*Id.* ¶ 53).

At that meeting, Humphrey and Yingzeng agreed to investigate Shi and her activities, understanding that they may uncover information that would help undermine her credibility. (*Id.* ¶ 63). While not referenced in the complaint but

---

[3] Plaintiffs refer to GSK PLC and GSK LLC collectively and interchangeably as "GSK" throughout their complaint. (Compl. ¶ 11).

[4] The complaint appears to identify Reilly, Zhao, and Cahill as "GSK officials," instead of identifying them as officers and employees of GSK China.

3

argued in the motion to dismiss, on April 26, 2013, Humphrey, on behalf of ChinaWhys (Shanghai) Consulting Co. Ltd. entered into a "Consultancy Agreement" with GSK China to investigate Shi. [ECF 19-5].[5] The Consultancy Agreement provides, *inter alia*, that the agreement is to be governed by the laws of the People's Republic of China, and that all disputes "arising out of or in connection with this Agreement" that cannot be amicably settled, must be submitted to the "China International Economic and Trade Arbitration Commission in Beijing for arbitration . . . ." (Consultancy Agreement ¶ 11).

During the investigation into Shi, Humphrey made repeated requests for copies of the whistleblower allegations against Shi, but these requests were denied. (Compl. ¶¶ 56, 64, 66). On June 6, 2013, Humphrey sent the investigation report on Shi to Zhao and Cahill. (*Id.* ¶ 70).

On June 12, 2013, *The Wall Street Journal* published an article about the bribery allegations in China and GSK PLC's investigation which revealed that GSK China's sales staff had engaged in widespread bribery in China. (*Id.* ¶¶ 71-73). On June 17, 2013, Jennifer Huang ("Huang"), senior counsel at GSK China R&D Company Ltd., emailed Humphrey to ask ChinaWhys to identify the source of the whistleblower emails, and on June 26, 2013, June Soon, executive secretary at GSK Pte Ltd.,[6] forwarded two whistleblower emails to Humphrey. (*Id.* ¶¶ 79-80). On June 27-28, 2013, GSK China's offices were raided by the Chinese police. (*Id.* ¶ 82). Subsequent to these raids, Huang and GSK China's head of business development, Leslie Chang, asked Humphrey to investigate China's Public Security Bureau and other government entities, including the Ministry of Public Security and the Economic Crimes Investigation Department, to ascertain who was conducting the investigation into GSK China's conduct. (*Id.* ¶¶ 82-84). Humphrey refused to investigate these government entities. (*Id.* ¶ 85). On July 1, 2014, Reilly and Humphrey met, and Reilly told Humphrey that Shi had "read your report and she will be coming after you." (*Id.* ¶ 87). On July 2, 2013, Reilly fled China for London. (*Id.* ¶¶ 89-90).

---

[5] Defendants attached the Consultancy Agreement to their motion to dismiss. [ECF 19-5]. "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *see also Cooper v. Samsung Elec. Am., Inc.*, 374 F. App'x 250, 253 n.3 (3d Cir. 2010) ("In general, when ruling on a motion to dismiss pursuant to 12(b)(6), a court may only consider the contents of the pleadings."). However, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben.*, 998 F.2d at 1196. While Plaintiffs do not assert a breach of contract claim, and claim to not be signatories to the Consultancy Agreement, they do not dispute the authenticity of this document, and it is clear that Plaintiffs' investigation of Shi was performed pursuant to this agreement. Thus, this Court may properly consider the Consultancy Agreement in the present analysis.

[6] GSK Pte Ltd. is a GlaxoSmithKline entity based in Singapore. [ECF 19-1 at 8].

On July 10, 2013, police raided ChinaWhys' office in Shanghai, and Humphrey's home in Beijing, China. (*Id.* ¶ 91). The police arrested both Humphrey and Yingzeng and interrogated them until past midnight. (*Id.*). Humphrey and Yingzeng were told this was "related to GSK." (*Id.*). Humphrey and Yingzeng were separately transported to the Shanghai Detention House and placed in crowded cells without furniture, hot water, clean bedding, or private toilet. (*Id.* ¶ 92). Both were prohibited from writing letters or making phone calls to family or lawyers, and were forced to sit on the floor for continuous hours, causing extreme pain. (*Id.*). On August 16, 2013, Humphrey and Yingzeng were formally arrested, and subjected to an "abusive" prosecution "lacking in any due process," a prosecution procured allegedly at the behest of Shi. (*Id.* ¶¶ 94-97). Constant delays in the proceeding prolonged Humphrey and Yingzeng's detentions. (*Id.* ¶ 95). Finally, on August 18, 2014, Humphrey and Yingzeng were tried, Humphrey was sentenced to two and a half years imprisonment, and Yingzeng was sentenced to two years imprisonment. (*Id.* ¶¶ 96-97). Until their release on June 9, 2015, both Humphrey and Yingzeng suffered ill treatment by the detention officials, and their medical issues were ignored and mistreated. (*Id.* ¶¶ 98-105). On June 17, 2015, Humphrey and Yingzeng were released and deported from China. (*Id.* ¶ 106). Plaintiffs allege that their business was "destroyed and their prospective business ventures eviscerated" by Defendants' conduct. (*Id.* ¶ 132).

Plaintiffs further allege that on September 19, 2014, GSK PLC issued a statement of apology to China, announcing that "GSK China Investment Co. Ltd (GSKCI) has been identified according to Chinese law to have offered money or property to non-government personnel in order to obtain improper commercial gains, and has been found guilty of bribing non-government personnel." (*Id.* ¶ 116). On the same day, China fined GSK PLC approximately $492 million for its activities in China. (*Id.*). Reilly was convicted of bribing doctors and was sentenced to three years in prison and deported from China.[7] (*Id.* ¶ 117). On September 30, 2016, GSK PLC entered into a settlement agreement with the Securities and Exchange Commission for its bribery practices in China, and agreed to pay $20 million in fines. (*Id.* ¶ 120).

**LEGAL STANDARD**

As noted, Defendants move to dismiss Plaintiffs' complaint pursuant to: (1) Rule 12(b)(1) on the basis that Plaintiffs have failed to allege facts sufficient to establish Article III standing for Plaintiffs' federal RICO claims and that diversity jurisdiction does not exist over Plaintiffs' state law claims; (2) Rule 12(b)(2) for lack of jurisdiction over GSK PLC; (3) Rule

---

[7] The complaint does not specify when or why Reilly returned to China after "fleeing" to London.

5

12(b)(6) for failure to state a claim; and (4) Rules 12(b)(7) and 19 for failure to join an indispensable party. Because this Court concludes that it lacks Article III and diversity jurisdiction over Plaintiffs' claims, only the legal standard for a Rule 12(b)(1) motion will be discussed.

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Constitution Party*, 757 F.3d at 357. Rule 12(b)(1) challenges may be either facial or factual. *Id*. A facial challenge asserts that the complaint does not allege sufficient grounds to establish subject matter jurisdiction.[8] *Id*. Where a Rule 12(b)(1) motion is filed prior to an answer, as is the case here, it will be considered a facial challenge to jurisdiction. *Id.* at 358. When considering such a facial challenge, a court must apply the same standard of review that would apply on a motion to dismiss under Rule 12(b)(6). *Id*. As such, well-pleaded factual allegations are taken as true, and reasonable inferences are drawn in the plaintiff's favor. *Id*. The complaint will be dismissed for lack of standing only if it appears that the plaintiff will not be able to assert a plausible claim of subject matter jurisdiction. *Cardio-Med. Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983). The burden to establish standing rests with the plaintiff. *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016).

**DISCUSSION**

Initially, Defendants argue that Plaintiffs lack standing to assert RICO claims and, further, that this Court lacks diversity jurisdiction over Plaintiffs' state law claims. These are threshold issues which must be decided before this Court considers Defendants' other arguments.

---

[8] A factual challenge, though not applicable herein, "is an argument that there is no subject matter jurisdiction because the facts of the case—and here the District Court may look beyond the pleadings to ascertain the facts—do not support the asserted jurisdiction." *Constitution Party*, 757 F.3d at 358.

*Standing To Assert Civil RICO Claims*

Plaintiffs bring their RICO claims under 18 U.S.C. § 1962(c) and (d).[9] Before a district court can consider the sufficiency of a plaintiff's civil RICO claims, however, it must first address whether the plaintiff has adequately pleaded sufficient facts to establish standing under 18 U.S.C. § 1964.[10] *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, (1985) (holding that a "plaintiff only has standing [under 18 U.S.C. § 1964] if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation"); *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000) (holding that "plaintiffs seeking recovery under RICO must satisfy additional standing criterion set forth in section 1964(c) of the statute"); *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 424 (E.D. Pa. 2014) (same). Section 1964 provides that any "person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." 18 U.S.C. § 1964(c). Thus, "[t]o bring a civil RICO claim, a plaintiff must satisfy two statutory elements to confer standing: (1) that she suffered an injury to her 'business or property'; and (2) that her

---

[9] Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Section 1962(d) states that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). "To establish a RICO claim, a plaintiff must show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002) (quoting *Sedima, S.P.R.L v. Imrex Co.,* 473 U.S. 479, 496 (1985)).

[10] Section 1964 provides, in part, that the "district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders . . . ." 18 U.S.C. § 1964(a).

injury was proximately caused by the defendants' violation of § 1962." *Sarpolis*, 26 F. Supp. 3d at 424 (citing *Maio*, 221 F.3d at 482-83).

While Section 1964 does not distinguish between foreign or domestic injuries, the Supreme Court recently explained that because RICO's private right of action does not have extraterritorial application, it "requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2111 (2016). In other words, claims that "rest entirely on injury suffered abroad [] must be dismissed." *Id.*

Instantly, Defendants assert that Plaintiffs lack standing to assert RICO claims because any alleged injury to Plaintiffs' business or property[11] was a "foreign" injury, as opposed to a "domestic" injury. [ECF 19-1 at 43-46]. It is not always "self-evident . . . whether a particular alleged injury is 'foreign' or 'domestic.'" *RJR Nabisco*, 136 S. Ct. at 2111. Plaintiffs' complaint vaguely contends that as a result of Defendants' alleged RICO violations, "Plaintiffs have been injured in their property [and] Plaintiffs' business was destroyed and their prospective business ventures eviscerated by Defendants' pattern of racketeering activity." (Compl. ¶ 132). Plaintiffs further allege that the injuries suffered "were directly and proximately caused by Defendants' racketeering activity." (*Id.* ¶ 133). In the motion to dismiss, Defendants contend that while Plaintiffs may have had numerous U.S. clients, the alleged injuries suffered were clearly foreign because Plaintiffs' business was based solely in China, they had offices only in China, no work was done outside of China, Plaintiffs resided in China and, finally, their business was allegedly

---

[11] Any physical and/or emotional injuries Humphrey's and Yingzeng may have suffered while in custody are not harms to business or property, and are not cognizable under RICO. *See, e.g., Magnum v. Archdiocese of Philadelphia,* 253 F. App'x 224, 227 (3d Cir. 2007) ("[P]hysical or emotional harm to a *person* is not property under civil RICO. Similarly, losses which flow from personal injuries are not property under RICO.") (internal citations and quotations omitted).

destroyed when Plaintiffs were imprisoned in China by Chinese authorities. [ECF 19-1 at 43-46]. To show that their alleged injury was domestic, Plaintiffs argue that the majority of ChinaWhys' contracts were with companies based in the United States and, as a result of Defendants' conduct, ChinaWhys lost significant revenue from the United States. (*Id.* ¶ 9). Further, Plaintiffs argue that their allegations of working with largely U.S. corporations and U.S. revenue streams is sufficient to allege a domestic injury. [ECF 23 at 34-38].

Neither the Third Circuit Court of Appeals, other Appellate Circuits, nor the District Court for the Eastern District of Pennsylvania have addressed what constitutes a domestic or foreign injury for civil RICO purposes subsequent to the *RJR Nabisco* decision, which made it clear that it was proper to dismiss claims that rested "entirely on injury suffered abroad." *RJR Nabisco*, 136 S. Ct. at 2111. Those district courts that have considered the issue after the *RJR Nabisco* decision have applied varying standards. As such, there is no consensus on what specific factors must be considered when deciding whether an injury is domestic or foreign. The parties here cite to numerous cases purportedly favorable to their respective positions.[12]

In considering these and other cases that have addressed the issue, there appears to be two emerging schools of thought. The first considers where the plaintiff lived at the time of the

---

[12] Defendants note that the *RJR Nabisco* decision focused on the question of whether the court has authority to recognize a cause of action for "injury suffered overseas," and ultimately concluded that claims resting "entirely on injury suffered abroad" must be dismissed. [ECF 19-1 at 44] (citing *RJR Nabisco*, 136 S. Ct. at 2109, 2011). Defendants argue that Plaintiffs' injuries were clearly suffered in China, and rely on *Bascunan v. Daniel Yarur Elsaca*, 2016 WL 5475998 (S.D.N.Y. Sept. 28, 2016), *Union Commercial Servs. Ltd. v. FCA Int'l Operations LLC*, 2016 WL 6650399 (E.D. Mich. Nov. 10, 2016), and *Exeed Indus., LLC v. Younis*, 2016 WL 6599949 (N.D. Ill. Nov. 8, 2016). Plaintiffs argue that their injuries were clearly domestic, and rely upon the decisions in *City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272 (S.D.N.Y. 2016), *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138 (C.D. Cal. 2016), *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768 (S.D.N.Y. 2016), *Akishev v. Kapustin*, 2016 WL 7165714 (D.N.J. Dec. 8, 2016). As discussed more fully below, this Court has carefully analyzed the criteria each of the district courts considered in deciding whether a civil RICO injury is domestic or foreign, and concludes that each district court's respective reasoning, when applied to the facts of this case, result in the same outcome: a finding that Plaintiffs' injuries were suffered in China, and not the United States.

alleged injury and where their property or business was located, among other related factors. *See Bascunan v. Daniel Yarur Elsaca*, 2016 WL 5475998, at *4-6 (S.D.N.Y. Sept. 28, 2016) (applying a "(1) who became poorer, and (2) where did they become poorer," test when finding that Chilean resident and citizen suffered a foreign injury when the plaintiff had millions of dollars stolen by Chilean defendants who fraudulently caused New York banks to wire the plaintiff's funds to the defendants' accounts in New York); *Union Commercial Servs. Ltd. v. FCA Int'l Operations LLC*, 2016 WL 6650399, at *4 (E.D. Mich. Nov. 10, 2016) (applying a "substantial effects" test, which requires the court to consider whether the effect of a defendant's conduct, *i.e.*, the injury, is foreign or domestic when finding injury was foreign where the plaintiff was owned by an Angolan citizen and sold motor vehicles in Angola and was harmed when U.S.-based supplier of vehicles ended distributor agreement after bribing Angolan officials and supplying an unauthorized distributor with the vehicles for sale in Angola); *Exeed Indus., LLC v. Younis*, 2016 WL 6599949 (N.D. Ill. Nov. 8, 2016) (relying on *Bascunan* when deciding injuries were foreign even though a large number of the plaintiffs' suppliers were in the United States where the plaintiffs were based in the United Arab Emirates); *see also City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272 (S.D.N.Y. 2016); *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138 (C.D. Cal. 2016); and *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768 (S.D.N.Y. 2016).

The second school of thought considers the location of the RICO conduct to be relevant to the inquiry. *See Akishev v. Kapustin*, 2016 WL 7165714, at *1-2, 7-8 (D.N.J. Dec. 8, 2016) (noting that when RICO conduct crosses borders, "the extraterritoriality analysis should be a two-way street," where the plaintiffs could have come from anywhere in the world but the defendants choose to operate their fraudulent scheme from the United States).

The *RJR Nabisco* decision strongly suggests that it is the location of the injury, and not the location of the injurious conduct, that is relevant to determine whether a particular plaintiff has standing to bring a civil RICO claim. However, under the facts and allegations of this case, this Court need not decide whether the focus is entirely on where the injury occurred or if the location of the conduct is relevant, because under any of the injury-focused tests employed by other district courts, and under a conduct-focused test, it is clear to this Court that the alleged injuries suffered by Plaintiffs are foreign, and not domestic.

Specifically, Plaintiffs' allegations establish that, while much of Plaintiffs' business comes from U.S. corporations, Humphrey and Yingzeng, at the time of the alleged conduct, lived in China, and Plaintiffs' business was based in China and assisted companies, both U.S. and non-U.S. entities, which sought to conduct business in China. (Compl. ¶¶ 6-9, 91).[13] Plaintiffs do not allege that they had offices in the United States or any assets or property in the United States. It is also clear that any business Plaintiffs lost was lost in China because that is where Plaintiffs provided their services to U.S. and non-U.S. multinational companies seeking to operate in China, in compliance with Chinese and non-Chinese laws.[14] In other words, companies came to Plaintiffs when they sought to do business in China, and it is in China that the effects of Defendants' alleged conduct were felt. When applying any of the methodologies employed by

---

[13]    This Court notes that ChinaWhys' "About Us" website page, which identifies both Humphrey and Yingzeng as people involved with the company, states that the company is there to assist "multinational corporations relocating their supply base to Asia and increasingly to China." [ECF 19-10]. It goes on to state that ChinaWhys "specializes in discrete risk mitigation solutions, consulting and investigation services to corporate clients . . . across Greater China and the Asia Pacific [and] provide[s] regular advice to the business community on risk management and conduct[s] services in China for large, medium, and small multinationals . . . ." (*Id.*).

[14]    While not dispositive, this Court notes that Plaintiffs' Consultancy Agreement with GSK China required payment in Chinese currency, [ECF 19-5 ¶ 3.1], and Plaintiffs, on the civil cover sheet created to initiate this case, identified China as the place of the incident or transaction underlying this case. [ECF 1-1 at 2].

the various district courts that have addressed this issue that have focused on the location of the injury, it is clear that Plaintiffs' injuries occurred in China, and not the United States.

Further, were this Court to consider where the alleged conduct occurred, the outcome would be the same. Even a cursory examination of Plaintiffs' allegations supports a finding that GSK China's conduct in China caused Plaintiffs' injuries [15] Specifically, all of Plaintiffs' contacts were with employees of either GSK China or GSK Pte Ltd., a Singaporean entity, and none were with Defendants. From the complaint, it is apparent that it was GSK China employees and GSK China's CEO who requested that Plaintiffs investigate Shi, an employee of GSK China living in China, for her alleged emails to Chinese authorities, and it was Shi who, through her contacts with the Chinese government, allegedly caused Humphrey and Yingzeng to be arrested by Chinese authorities and held in a Chinese prison. (Compl. ¶ 25-53, 79-107). Aside from a conclusory allegation that GSK PLC exercised control over GSK China, (*id.* ¶ 10), and certain allegations that, after the bribery conducted by GSK China was discovered, GSK PLC continued to mislead the public about what had occurred, (*id.* ¶ 108-15), Plaintiffs do not allege any facts that would implicate either of the named Defendants, as opposed to GSK China, let alone GSK LLC, a U.S. subsidiary of GSK PLC. In short, Plaintiffs have not alleged any facts to support that the claimed wrongful conduct occurred in the United States. Thus, even if this Court were to consider the location of the alleged conduct, it would still conclude that Plaintiffs' injuries are foreign, and not domestic.

Consequently, under either test, Plaintiffs have failed to adequately plead sufficient facts to establish that they suffered a domestic injury resulting from Defendants' alleged RICO

---

[15] Notably, Plaintiff did not name GSK China as a defendant in this case. Instead, Plaintiffs collectively and interchangeably referred to GSK PLC and GSK LLC as "GSK," in an apparent attempt to assert that the wrongful conduct occurred in the United States.

violations. For this reason, Plaintiffs lack standing to assert civil RICO claims, and these claims are dismissed. *See, e.g.*, *Sedima*, 473 U.S. at 496 (holding that a "plaintiff only has standing [under 18 U.S.C. § 1964] if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."); *RJR Nabisco*, 136 S. Ct. at 2111.

### *Diversity Jurisdiction Over State Law Claims*

Plaintiffs' remaining claims for fraud, intentional infliction of emotional distress, negligent infliction of emotional distress, and civil conspiracy are all premised on Pennsylvania law. Plaintiffs assert that this Court has diversity jurisdiction over these state law claims pursuant to 28 U.S.C. § 1332. Defendants disagree.

> Section 1332 provides that:
>
> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--(1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State; (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1332(a).

Complete diversity is required, meaning that "no plaintiff can be a citizen of the same state as any of the defendants." *Rose v. Husenaj*, 2017 WL 3776226, at *1 (3d Cir. Aug. 31, 2017). "When pleading diversity jurisdiction for natural persons, a plaintiff must allege that each person is a citizen of a different state from him." *Id.* "Citizenship is synonymous with domicile, and the domicile of an individual is his true, fixed and permanent home and place of habitation." *Id.* A "corporation shall be deemed to be a citizen of every State and foreign state by which it

has been incorporated and of the State or foreign state where it has its principal place of business," 28 U.S.C. § 1332(c)(1), whereas the "citizenship of an LLC is determined by the citizenship of its members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010). "The burden is on the plaintiff to affirmatively allege the essential elements of diversity jurisdiction." *McCracken v. Ford Motor Co.*, 2009 WL 1185686, at *1 (E.D. Pa. May 1, 2009); *see also Freidrich v. Davis*, 989 F. Supp. 2d 440, 442 (E.D. Pa. 2013) ("The party invoking diversity jurisdiction bears the burden of proof.").

Nowhere in Plaintiffs' complaint do Plaintiffs identify the citizenships of Humphrey, Yingzeng,[16] or ChinaWhys. (Compl. ¶ 6-8). Plaintiffs have also failed to allege either the place of incorporation of GSK PLC, noting only that its headquarters is in England, Pennsylvania, and North Carolina, (*id.* ¶ 10), or the citizenship of any of the members of GSK LLC, instead providing only that GSK LLC's principal place of business is in Pennsylvania. (*Id.* ¶ 11). By so pleading, Plaintiffs have failed to satisfy affirmatively the requirements of diversity jurisdiction.[17] As such, this Court lacks diversity jurisdiction.

In addition, although Yingzeng claims to be an American citizen, she appears to be domiciled outside of the United States.[18] Thus, she is neither a "citizen[] of a State" of the

---

[16] Regarding Yingzeng, Plaintiffs allege only that she is "an American citizen," but do not identify in which State she is domiciled. (Compl. ¶ 7).

[17] This Court notes further that it appears that Humphrey currently resides in the United Kingdom, where GSK PLC is alleged to maintain one of its headquarters. [ECF 1-1 at 2]; (Compl. ¶ 10). If both Humphrey and GSK PLC are citizens of the United Kingdom, complete diversity does not exist.

[18] Based on the allegations in the complaint, Yingzeng and Humphrey both lived in Beijing when they were arrested by Chinese authorities, (Compl. ¶ 91), and were subsequently deported from China. (*Id.* ¶ 106). The civil cover sheet attached to the complaint by Plaintiffs provides that Humphrey, Yingzeng's husband, maintains an address in the United Kingdom. [ECF 1-1 at 2]. This suggests that Yingzeng is currently living in the United Kingdom, and not the United States. Further, nowhere do Plaintiffs allege that Yingzeng lives in the United States. Plaintiffs' failure to affirmatively plead in their

United States nor a "citizen[] or subject[] of a foreign state," and, therefore, cannot sue or be sued in federal court based on diversity jurisdiction. *See Swiger v. Allegheny Energy, Inc.*, 540 F.3d 179, 184 (3d Cir. 2008) ("An American citizen domiciled abroad, while being a citizen of the United States is, of course, not domiciled in a particular state, and therefore such a person is 'stateless' for purposes of diversity jurisdiction."); *see also Freidrich v. Davis*, 767 F.3d 374, 378 (3d Cir. 2014) (noting that an American citizen domiciled in Germany is "stateless" for diversity purposes and cannot sue or be sued in diversity).[19] For this additional reason, Plaintiffs cannot rely upon diversity jurisdiction to have their state law claims adjudicated in federal court and, therefore, Plaintiffs' state law claims are dismissed.[20]

**CONCLUSION**

For the reasons stated herein, Defendants' motion to dismiss is granted, and Plaintiffs' complaint is dismissed. An Order consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.

---

complaint, or even to state in their response, that Yingzeng resides in the United States, prevents Plaintiffs from satisfying their burden to establish that diversity jurisdiction exists.

[19] The Third Circuit noted:

> This conclusion, while troubling, is compelled by the language of the statute and by precedent from both the Supreme Court and our circuit. We find this troubling because it closes the doors of federal court to a citizen of a State who wishes to sue another citizen based on diversity, as in this case. It may be that this "stateless person" doctrine is an unintended consequence flowing from Congress' now possibly outdated assumption that U.S. citizens generally reside in the United States.

*Freidrich*, 767 F.3d at 378.

[20] Because this Court lacks jurisdiction to hear Plaintiffs' federal and state law claims, it does not address Defendants' remaining arguments.